# PLAINTIFF'S EXHIBIT 2

Transcript re Deposition of Jacob Mou

---

*In The Case Of*

**Lillian Franklin, Individually and on Behalf of All Others Similarly Situated,**

**v.**

**Wells Fargo Bank, N.A.,**

**14-cv-2349 MMA (BGS)**

1        IN THE UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4   LILLIAN FRANKLIN,              )

5   INDIVIDUALLY AND ON           )

6   BEHALF OF ALL OTHERS          )

7   SIMILARLY SITUATED,           )

8           Plaintiff,            )

9        v.                       ) No. 14-cv-2349

10  WELLS FARGO BANK, N.A.,        )      MMA (BGS)

11          Defendant.            )

12  _____

13

14

15

16      Deposition of JACOB MOU, taken

17      at 1123 SW Yamhill Street, Portland,

18      Oregon, commencing at 2:00 p.m.,

19      Tuesday, November 25, 2014, before

20      Shanyelle L. King, a Shorthand Reporter

21      and Notary Public.

22

23

24  JOB No. 1971022

25  PAGES 1 - 25

                                        Page 1

```
 1    APPEARANCES:
 2

      Attorney for Plaintiff:
 3        KAZEROUNI LAW GROUP, APC
          BY MR. ABBAS KAZEROUNIAN
 4        245 Fischer Avenue
          Suite D1
 5        Costa Mesa, CA  92626
          (800) 400-6808
 6        ak@kazlg.com
 7

      Attorney for Plaintiff:
 8        HYDE & SWIGART
          BY MR. JOSHUA B. SWIGART
 9        2221 Camino del Rio South
          Suite 101
10        San Diego, CA  92108
11        (619) 233-7770
12        josh@westcoastlitigation.com
13

      Attorney for Defendant:
14        SEVERSON & WERSON
          BY MR. KALAMA M. LUI-KWAN
15        One Embarcadero Center
16        26th Floor
17        San Francisco, CA  94111
          (415) 398-3344
18        kml@severson.com
19

      Attorney for Defendant:
20        SEVERSON & WERSON
21        BY MS. DIVYA S. GUPTA
22        19100 Von Karman Avenue
          7th Floor
23        Irvine, CA  92612
24        (949) 442-7110
25        dsg@severson.com
```

```
1                       I N D E X

2                                            Page

3    Examination by Mr. Kazerounian            4

4

5

6                      EXHIBIT

7    Number          Description            Page

8

9    Exhibit 1      Notice of Deposition       7

10                  (Attached hereto.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext National Deposition & Litigation Services
866 299-5127

1          MR. LUI-KWAN:  Before we begin, I just want    13:37:56

2    to add, for the record, that the parties have agreed that

3    the content of this deposition will be deemed

4    confidential.  Not to be used for any purpose unrelated to

5    this action.  Not to be shared with others outside the    13:38:12

6    immediate needs of this litigation.  And not to be filed

7    with the Court without first discussing the matter.

8          MR. KAZEROUNIAN:  The only thing I would

9    add to that is, if you would, as soon as the deposition is

10   over, you guys try and tell us which bits you want to be    13:38:27

11   confidential.  So that, for the filing of any papers

12   subsequent to today, we know what to redact and maybe file

13   under seal, or whatever.

14          MR. LUI-KWAN:  Fair enough.

15          MR. KAZEROUNIAN:  Thank you.    13:38:42

16

17                    JACOB MOU,

18   Having first been sworn by the Notary Public for the State

19   of Oregon to tell the truth, testified under oath as

20   follows:    13:38:43

21

22                    EXAMINATION

23      BY MR. KAZEROUNIAN:

24   Q    Good afternoon, sir.

25   A    Good afternoon.    13:38:45

                                          Page 4

```
 1   Q    Can you state and spell your name for the record,      13:38:45

 2   please.

 3   A    Jacob Mou.  J-A-C-O-B.  M-O-U.

 4   Q    And that's your full name?

 5   A    That's my full name.                                   13:38:56

 6   Q    Okay.  Perfect.  I just want to know if there's any

 7   middle names.  And what is your occupation?

 8   A    I work for Wells Fargo.  I'm an Analytic Manager.

 9   Q    Have you ever had your deposition taken before?

10   A    Yes, I have.                                           13:39:11

11   Q    And when was the last time you had your deposition

12   taken?

13   A    I don't remember.  Probably a couple of years ago.

14   Q    How many times have you had your depo taken?

15   A    I'm going to guess twice.                              13:39:22

16   Q    Twice.  Okay.  Just so that we have a clear

17   understanding on record, I'm sure your counsel has been

18   over some of the rules of a deposition, but I'll just go

19   over some of the main ones so that we have an

20   understanding.                                             13:39:32

21   A    Okay.

22   Q    The first rule is, if you don't understand my

23   question, which is very likely, you let me know, and I'll

24   try to rephrase for you.

25   A    Sure.                                                  13:39:44
```

                                                        Page 5

1    Q    If, however, I ask a question, and you answer it, I'm  13:39:45

2    going to presume that you understood it.  Fair enough?

3    A    Okay.

4    Q    Throughout the deposition, I'm entitled to your best

5    estimates, but I don't want you to guess.  You know the    13:39:51

6    difference?

7    A    Sure.

8    Q    You do understand?

9    A    Yes, I do.

10   Q    If you don't feel well, or you need a break, let me    13:39:58

11   know.  Or if you want to speak to your counsel, just say

12   so.  You're completely entitled.  Okay?

13   A    Okay.  Yeah.

14   Q    The is there any reason why you can't give me your

15   best testimony today?                                      13:40:10

16   A    No.

17   Q    So you're not on any medication, or anything like

18   that?

19   A    No.

20   Q    One of the natural things we do as human beings is    13:40:16

21   that we anticipate what the other person's going to say,

22   or ask the question.  So the court reporter to my left, to

23   your right, can only transcribe what one person is saying

24   at any one time.  So even if you know what I'm going to

25   ask you, wait for me to finish the question, and then      13:40:32

Page 6

1    answer.  And I'll try to reciprocate.  Is that okay?        13:40:35

2    A    Yes.

3    Q    In the same vein, as human beings, we have a tendency

4    to gesture, or to say uh-huh, or mm-hmm.  But we don't

5    know what that means on a transcript.  So if you can just,   13:40:45

6    you know, verbalize, and try and be articulate with your

7    responses, so we know what you're saying.

8    A    Sure.  Remind me if I make those mistakes.

9    Q    Thank you.  Lastly, I am going to put you on notice

10   that you're going to be given in, I don't know, a couple     13:41:02

11   of weeks, an opportunity to read over your transcript.

12   It's kind of going to be in a booklet form. It's going to

13   be question, answer.  Question, answer.  And you're going

14   to be given an opportunity to change your testimony should

15   you see fit.  But if you make any material changes,          13:41:15

16   somebody, one of the counsel, one of attorneys, can maybe,

17   at a later date, make a comment on your credibility.  Do

18   you understand that?

19   A    Yes.

20   Q    Perfect.  With that being said, have you seen --        13:41:29

21   let's mark this up as Exhibit 1.  Have you seen this

22   before?

23              (Exhibit 1 marked.)

24   A    Yes, I have.

25   Q    It's a deposition notice.  And have you seen the        13:41:45

1    categories in that document?                        13:41:48

2    A    Yes.  On the second page you mean.  Right?  Yes.

3    Q    Second and third page.

4    A    Yes.  Yes, I have.

5    Q    And you're the person that is most qualified to    13:41:56

6    respond to these categories?

7    A    Yes, I am.

8    Q    At Wells Fargo?

9    A    Yes.

10   Q    Do you know what this case is, you know, roughly is  13:42:03

11   about?

12   A    Yes, I do.

13   Q    Okay.  And can you tell me what it's about.

14   A    It's about calling customers.  Calling phone numbers

15   that, on the cell phone, that may or not be our customer.  13:42:15

16   Q    Do you know which, you know --

17   A    For the Consumer Credit Card group.

18   Q    Okay.  Of Wells Fargo?

19   A    Of Wells Fargo.  Yes.

20   Q    Yes.  And that's who is the defendant in this case.  13:42:31

21   Right?

22   A    Yes.

23   Q    Okay.  And when you say "calling," what method of

24   calling are we talking about?

25   A    Auto dialer.                                      13:42:51

                                                         Page 8

```
1    Q    Now you're the Analytics Manager at Wells Fargo.     13:42:53

2    Correct?

3    A    Yes.

4    Q    And how long have you had that occupation?

5    A    Sixteen years.                                        13:43:00

6    Q    In that same position?

7    A    In the general area.  Not exactly the same position.

8    Q    Okay.  And what does the Analytics Manager do?  What

9    are your job duties?

10   A    My current job duty is oversee the Auto Dialer group,  13:43:13

11   the MIS group, and the Help Desk group.

12   Q    Okay.  What does the MIS stand for?

13   A    Management Information System.

14   Q    Say that again.

15   A    Management Information System.                         13:43:33

16   Q    Okay. And what do you mean by the help desk?

17   A    We manage it.  Support the first level help desk of

18   the hardware and software we use in the group.

19   Q    So it's an internal help desk?

20   A    Internal, yes.  Yes.                                   13:43:49

21   Q    So when you say you oversee the auto dialer

22   department, what does that mean?

23   A    I manage the group that manages the auto dialer.

24   Q    So you manage the management?

25   A    Yes.                                                   13:44:04
```

Page 9

1    Q     What are your day-to-day duties, as it pertains to        13:44:05

2    the dialer department?

3    A     Setting guidelines, calling strategy, examining

4    outcomes.

5    Q     Examining the --                                          13:44:21

6    A     Examining the calling outcomes, the reporting

7    outcomes.

8    Q     And when you say the reporting outcomes, do you get

9    daily reports from the campaigns that have been called?

10   A     They're available to me.  I will look at them from        13:44:29

11   time to time.  Yes.

12   Q     And the dialer records for the consumer credit cards,

13   are they available for the class period in this case?

14                 MR. LUI-KWAN:  Objection.  Vague.  Go ahead

15   and answer.                                                     13:44:51

16                 THE WITNESS:  I'd like you to ask the

17   question again.  You mean the --

18   Q     BY MR. KAZEROUNIAN:  Sure.  Let me break that down.

19   Do you know what the class period is, in this case?

20   A     Yes.  I do.                                               13:44:59

21   Q     Can you tell me the class period.

22   A     November 1st of 2009, to September 17th, 2014.

23   Q     Perfect.  Now, have you -- does Wells Fargo have

24   dialer records for the outbound calls they made in that

25   period of time, the class period?                              13:45:21

```
 1    A     What do you mean by "dialer records"?           13:45:23

 2    Q     Like, the numbers you called.  A list of all the

 3    numbers that were called.

 4    A     They're in the database.  They're not in a report

 5    file.                                                  13:45:33

 6    Q     But that information is available?

 7    A     Yes.

 8    Q     Do you know the class definition for this class

 9    action?

10    A     The definition -- my understanding is that we're  13:45:49

11    calling the cell phone number, not to the subscriber, or

12    the owner, of the cell phone.

13    Q     Say that again?  You may not know it.  If you don't

14    know it, that's fine.  I mean, I can try and refresh --

15    A     That's my understanding.                         13:46:07

16    Q     Okay.

17               MR. LUI-KWAN:  I'm not sure the witness

18    would be able to recite the class definition.

19               THE WITNESS:  Yeah.  I need a note or

20    something to look at that, probably.  Yeah.            13:46:21

21    Q     BY MR. KAZEROUNIAN:  So do you know how many class

22    members are in this case?  Or are in this class?  In this

23    Franklin v. Wells Fargo?

24    A     We know how many phone numbers that we called during

25    this period of time.                                   13:46:46
```

Page 11

1    Q     And how many phone numbers is that?              13:46:47

2    A     The phone numbers we called during this period of

3    time is 11,056,718.

4    Q     That's landline and cell phone?

5    A     That's landline and the cell phone.  That's correct.  13:47:00

6    Q     And those are unique numbers?

7    A     That's correct.  Unique, too.

8    Q     And do you know how many cell -- only cell phones,

9    unique cell phones, were called in that --

10   A     The unique cell phone out of this is 4,076,207.      13:47:10

11   Q     Now, I'm going to represent to you that that

12   4,076,207 would be the number of people in the class.

13   A     Yes.

14   Q     Is that your understanding as well?

15            MR. LUI-KWAN:  Objection.  Calls for a          13:47:37

16   legal conclusion.

17   Q   BY MR. KAZEROUNIAN:  If you understand.

18   A     I understand what I'm asked to do here is to find out

19   the 11 million, that's the unique calling number.  Out of

20   those are -- we're using a methodology to figure out those  13:47:48

21   other cell phone numbers.

22   Q    Okay.  So you were tasked with finding out how many

23   unique cell phone numbers were called in that class

24   period --

25   A     That's correct.                                    13:47:58

                                                        Page 12

1    Q    You've got to let me finish.                    13:47:59

2    A    I didn't know you didn't finish.  Sorry about that.

3    Q    So that's what you were tasked with.  Right?

4    A    Yes.

5    Q    Now, can you tell me the methodology that you used to  13:48:08

6    come up with that 4,076,207.

7    A    We got the cell phone database from our internal

8    partner, EPSS.

9    Q    Sorry.  You got the cell phone what?

10   A    Cell phone database from EPSS.                   13:48:30

11   Q    And what does that stand for?

12   A    Enterprise Privacy Scrub Service.

13   Q    Now, that's a software that you get?  Or is it a

14   third-party vendor that you use to help you?

15   A    My understanding, they use vendors.  But it's the  13:48:53

16   internal partner, that Wells Fargo department, that I

17   partner with.

18   Q    Okay.  So you get this database.

19   A    Right.

20   Q    Right.                                           13:49:05

21   A    They have all the seven-digit blocked numbers, the

22   current block list numbers, that we received.  And also,

23   we received the landline/cell phone, cell phone/landline

24   porting database for the class period as well.

25   Q    Okay.                                            13:49:29

                                                          Page 13

1    A    So first what we did is, out of the 11 million, the    13:49:31

2    unique phone numbers we called, we matched what are these

3    numbers, which are the numbers that have the same

4    seven-digit block numbers.  So that's what we consider as

5    a cell phone.  Even though we don't have the historical --    13:49:48

6    it's the current blocked number.  After that, we're

7    looking at the remainder of the numbers.  We look at the

8    porting number.

9              First we looked at the landline, port to cell.

10   So we looked at the date, the landline, port to cell.    13:50:06

11   Then we matched the most recent calling date on the phone

12   number.  If the date is after the porting date of the

13   cell, then we count that as part of the four million as

14   well.

15             There's another layer that we looked at.  For    13:50:27

16   the remaining unqualified one, they also have a file to

17   show multiple porting.  Not -- so the one I mentioned

18   earlier was a single porting from land to cell.  The

19   multiple is land to cell, cell to land.  And also could be

20   land to cell.    13:50:51

21             This algorithm was too complicated, so I kind of

22   favored the cross-population.  I only look at the first

23   land-to-cell date, even though it might be ported to land

24   again later.  But I'm not looking at that on the

25   algorithm.  Then I also -- I'm looking at the most recent    13:51:09

Page 14

```
 1    calling date on the phone number.  If that phone number    13:51:09

 2    calling date is after the land-to-cell porting date, I

 3    will probably calculate that as a part of the four million

 4    as well.  So was this two, three population added up to

 5    this 4,076,207.                                            13:51:26

 6    Q    Okay.  And those are all unique numbers that you --

 7    A    All unique numbers.

 8    Q    Okay.  Did you say -- did you mention algorithm?

 9    A    Yes.  I did mention algorithm.  I'm saying it's --

10    they've got multiple porting there.                        13:51:41

11    Q    Right.

12    A    I need to have the query to look for the multiple

13    query.  Instead of doing that, I made a simple query, only

14    look at the first one, to make this query accurate and

15    simple.  But the one that I did not calculate is          13:51:58

16    potentially -- it went from cell to land.

17    Q    Back to land.  So it's over inquiries, and not

18    under --

19    A    Over.  Right.  Right.  Correct.  Yes.

20    Q    Now, were there any -- was anything done to ensure    13:52:13

21    the accuracy of this mining or scrubbing process?

22    A    Yes.  The programmer created the query to capture, as

23    I mentioned.  His manager reviewed every single query.

24    Was a review, as another person, to look at that.  And

25    then the manager is satisfied with the query the developer  13:52:42
```

Page 15

```
 1    created.                                           13:52:46

 2    Q    Going back to the first step.  The 11 million figure.

 3    11,056,718 unique numbers called.  Landline and cell

 4    phones.

 5    A    Right.                                        13:52:56

 6    Q    How did you get that set of unique numbers as your

 7    starting point?  And where did you get it from?

 8    A    Dialer calling history sets in the database.  The

 9    developer goes in to look at the most recent date called

10    on the phone number.  He captured the most recent date on  13:53:18

11    the phone number for each and every phone number.  And you

12    added up that number -- phone number caps out to this

13    11 million.

14    Q    And do you check the accuracy of that?

15    A    Accuracy of that is that, that the PC process the      13:53:36

16    query of -- that the developer created.  So, as you know,

17    the computer does certain things very accurately, based on

18    the query.  The accuracy is, the developer gets a peer

19    review to look at his query, make sure the query is what

20    designed to come to the outcome.                          13:53:59

21    Q    Right.  So the computers almost have a hundred

22    percent accuracy rate, dependent -- but it's all

23    dependent -- the variable is the query?

24    A    Correct.

25    Q    All right.  And you have a second tier of checking on  13:54:10
```

                                                        Page 16

1    the query, to make sure that you're getting correct data.    13:54:14

2    Correct?

3    A    Yes.

4    Q    Now these telephone numbers, is there a way that you

5    can match them up to account holder's data?  So when I    13:54:41

6    mean data, I mean name and address.

7    A    Yes.  I can.

8    Q    You can.  Now you mentioned earlier that some of

9    these numbers were ported.  Correct?

10    A    Yes.    13:54:55

11    Q    So it's possible that some of the calls were made to

12    people that are no longer account holders, but that number

13    used to belong to an account holder.  Right?

14    A    I have no way to know who is getting the call.

15    Q    I understand that, and I'm going to get there.    13:55:11

16    You're jumping one step ahead of me.  My question is, that

17    you are -- first of all, is it your policy and procedure

18    to only call account holders?

19            MR. LUI-KWAN:  Objection.  Vague.

20            Also outside the scope of the notice, as to    13:55:25

21    policies and procedures.

22    Q    BY MR. KAZEROUNIAN:  I just want to make sure that,

23    well, you kind of answered my question.  But I want to get

24    there.  The telephone numbers that are in the four million

25    number -- the four million figure.  The 4,076,207.  Can    13:55:42

Page 17

1    you match those numbers up to an account with an address   13:55:49

2    and a name?

3    A    Yes.

4    Q    Now, if any of those calls were made to people that

5    are no longer account holders, can you tell whether they   13:55:59

6    are now account holders or not?

7    A    Say that again, please.

8    Q    Sure.  Those numbers, you said, can be matched up to

9    an account name and address.  Right?

10   A    Yes.                                                13:56:20

11   Q    But that's the name and address that was given with

12   that number at the time that some kind of application was

13   filled in.  Right?

14   A    Yes.  My account -- it's on the system.  The phone

15   number has an account associated with.  It has a name and  13:56:32

16   address associated with it as well.

17   Q    Now, when the calls were made, it's possible that

18   that number no longer belonged to that account holder.

19   Correct?

20   A    Yes.                                                13:56:45

21   Q    What I'm asking you is, is it possible to tell, when

22   the call was made, whether we knew that the recipient was

23   an account holder or not?

24              MR. LUI-KWAN:  Objection.  Vague.

25              Go ahead and answer.                          13:56:57

                                                             Page 18

```
 1                    THE WITNESS:  It's not possible.  I would    13:56:58

 2     not know who owns the number.  Who's answering the phone

 3     at that time.  I would not know.  I'm calling the person

 4     on the account.

 5     Q    BY MR. KAZEROUNIAN:  Okay.  Now, if the person tells   13:57:09

 6     you, I'm not who you're looking for.  Do you notate that

 7     on the account?

 8                    MR. LUI-KWAN:  Same objection.

 9                    THE WITNESS:  Collection -- collector group

10     does that.                                                  13:57:22

11     Q    BY MR. KAZEROUNIAN:  But do they do that?

12     A    Yes.  They do.

13     Q    Can you run a search for that?

14                    MR. LUI-KWAN:  Objection.  Vague.

15               Outside the scope of the notice --               13:57:38

16                    THE WITNESS:  It's possible.  Oh, sorry --

17                    MR. LUI-KWAN:  -- also calls for

18     speculation.  Go ahead and answer.

19                    THE WITNESS:  It's possible.  I haven't

20     been asked do it.  It's data.  I might be able to, but I   13:57:49

21     haven't done it yet.

22     Q    BY MR. KAZEROUNIAN:  So you don't know?

23     A    I don't know.

24     Q    Now, the list of the 4,076,207.  If your counsel

25     instructs you to, you can provide this -- these numbers,   13:58:09
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    matched with names and addresses, to a third party.   If      13:58:12

 2    they ask you do that, you have the ability to do that.

 3    Correct?

 4              MR. LUI-KWAN:  Objection.  Vague as to

 5    third party.                                                   13:58:21

 6              MR. KAZEROUNIAN:  Claims Administration.

 7              MR. LUI-KWAN:  Go ahead and answer.

 8              THE WITNESS:  So you are saying if I'm

 9    asked to do -- to supply the name and address for this

10    four million phone numbers, if I can do that or not.          13:58:30

11    Q    BY MR. KAZEROUNIAN:  Yes.

12    A    Yes, I can.

13    Q    In a tabulated way, that's electronic searchable.

14    Right?

15    A    Yes.                                                     13:58:40

16    Q    Are you -- to what degree of certainty, I mean, like,

17    if you can give me a percentage, if you can, the 4,076,207

18    people are the people, are the number of unique cell

19    phones called by the dialer in the class period.

20    A    I'm very confident with the query that my team          13:59:17

21    produced that produced this number.

22    Q    Over 95 percent accurate?

23              MR. LUI-KWAN:  Objection.

24    Q    BY MR. KAZEROUNIAN:  To your best estimation.  I'm

25    not asking for a precise.                                     13:59:29
```

Page 20

```
 1    A    All I can say is, my team looked at it.  We all        13:59:32

 2    looked at it.  We're very comfortable with what the query

 3    could produce.  So we think this is an accurate number.

 4    Q    I understand.  I'm asking for your best estimation.

 5    So that when I get queried, I can say I asked you that        13:59:45

 6    question.  To what degree of confidence, to your best

 7    estimation.  Is it more than 70 percent?  More than 80

 8    percent?  More than 90 percent?

 9              MR. LUI-KWAN:  Objection.  Go ahead and

10    answer.                                                      14:00:00

11              THE WITNESS:  Well, you asked me not to

12    guess.  Now you're asking me to guess.

13    Q    BY MR. KAZEROUNIAN:  No.  I'm not asking you to

14    guess.  I'm asking you to estimate.  If you can.

15    A    Like I said, I'm very confident.  I do not know         14:00:10

16    what's the value of 90, 95.  I don't know.

17              MR. LUI-KWAN:  Can we go off the record?

18              (Discussion off the record.)

19              MR. KAZEROUNIAN:  Yeah.

20    Q    BY MR. KAZEROUNIAN:  So the methodology that you        14:00:14

21    described to come up with the 7,076,207 figure, you said

22    you're confident with that. Right?

23              MS. GUPTA:  Four million.

24              MR. KAZEROUNIAN:  Four million.  What did I

25    say?                                                         14:00:56
```

                                                         Page 21

```
 1                 MS. GUPTA:  Seven million.              14:00:58

 2     Q    BY MR. KAZEROUNIAN:  Oh, four million.

 3     A    Four million.  Okay.

 4     Q    You said you're very confident with that number?

 5     A    Yes.                                           14:01:01

 6     Q    Can you think of a more accurate methodology or

 7     procedure that you could have conducted to get a more

 8     accurate data than this?

 9     A    No.  This was the data -- was the information I had.

10     This is best way, I believe, that would produce this    14:01:10

11     number.

12     Q    Okay.

13                 (Recess taken from 2:01 to 2:03 p.m.)

14     Q    BY MR. KAZEROUNIAN:  Just one -- really one more

15     question.  Which is that, before you came up with the    14:03:51

16     4,076,207 figure, you had to work off the complete

17     universe, which is the 11,056,718 figure.  Right?

18     A    Yes.

19     Q    Now, are you sure that you got all the databases, all

20     the dialer, that would be included to create this        14:04:11

21     universe?  There's nothing left on the periphery that you

22     guys have not checked?  We have all the data here.  Right?

23     A    Yes.  We do have all the data here.

24     Q    And you're confident about that?

25     A    Yes.                                                 14:04:27
```

Page 22

1             MR. LUI-KWAN:  I have one housekeeping        14:04:29

2    matter.  I just want to make sure that we have the right

3    to read and sign the transcript.

4             MR. KAZEROUNIAN:  Of course.  So how long

5    do you need to review it?  Actually, let's go off the      14:04:39

6    record.

7                  (Off the record.)

8             MR. KAZEROUNIAN:  Thank you very much for

9    your time, sir.  And we're done.  No more questions.

10           The only thing is, is that we stipulated that    14:08:18

11   you would get the original transcript to Defense Counsel's

12   office by next Tuesday.  And the deponent would have one

13   week from there to let us know of any changes to the

14   transcript.  If we're not notified of any changes, we'll

15   presume that none were made.  The original will be kept in  14:08:33

16   Defense Counsel's custody, and made available upon

17   reasonable notice for future hearings or trial.

18             MR. LUI-KWAN:  Agreed.

19           (DEPOSITION ADJOURNED AT 2:08 P.M.)

20

21

22

23

24

25